**PIONEER HI–BRED INTERNATIONAL, INC., Plaintiff,**

v.

**WILSON HYBRIDS, INC., Defendant.**

**Civ. No. 78–279–2.**

United States District Court, S.D. Iowa, C.D.

May 11, 1982.

As Amended July 1, 1982.

Donald H. Zarley, Michael G. Voorhees, Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, Iowa, for plaintiff.

H. Robert Henderson, Michael O. Sturm, Richard L. Fix, Henderson, Strom, Sturm, Cepican & Fix, Des Moines, Iowa, J.C. Salvo, Harlan, Iowa, for defendant.

VIETOR, District Judge.

This action for unfair competition and trademark infringement under both federal and Iowa trademark laws was tried by the court without a jury. Jurisdiction rests on 28 U.S.C. § 1338. Both parties are in the business of producing and selling hybrid seed corn, and plaintiff alleges that defendant, by adopting and using certain identifying marks, has infringed on plaintiff's marks and is unfairly competing with plaintiff. Plaintiff seeks injunctive relief and also seeks to be awarded its costs and reasonable attorneys fees.

## FINDINGS OF FACT

Plaintiff (hereinafter called Pioneer) is an Iowa corporation with its principal place of business in Des Moines, Iowa. Since 1926, when it was founded, Pioneer has been in the business of raising and selling agricultural seeds, primarily hybrid seed corn. Pioneer, like Iowa corn in July, grew and grew. It now does business throughout the United States and in many foreign countries. From 1964 through 1980 its sales totaled nearly 2½ billion dollars for over 88 million bags of seed.

Defendant (hereinafter referred to as Wilson) is an Iowa corporation with its principal place of business in Harlan, Iowa. Like Pioneer, Wilson began business in 1926 and it, too, is in the business of raising and selling agricultural seeds, primarily hybrid seed corn. Wilson's growth has been far more modest than Pioneer's. Wilson's trade area includes parts of Iowa, Nebraska, South Dakota, Missouri, Kansas and the Texas Panhandle. (At all times material, Pioneer was also doing business in Wilson's trade area.) Wilson's total sales, which have increased dramatically since 1968, equal about 1% of Pioneer's total sales.[1] In Wilson's strongest trade area, the eastern one-third of Nebraska, it enjoys about 2.5% market penetration (percentage of acres planted with the Wilson brand). Its market penetration in the western one-third of Iowa, its second best trade area, is about 1.5%.

Both Pioneer and Wilson provide free agronomy services. Some of these services are: providing advice on growing corn, holding field demonstrations, printing and distributing service publications, and conducting winter agronomy meetings. These services are provided to customers and non-customers (who are, of course, potential customers), and the services are designed to indirectly, if not directly, promote sales of seed.

Prior to 1962, Pioneer had used a number of different identifying signs and symbols. This lack of continuity became a matter of concern to Pioneer's advertising director, who communicated his concern to Pioneer's board of directors in a comprehensive report in the spring of 1962. The board responded to the report by retaining Design Consultants, Inc. of Chicago, Illinois, to overhaul Pioneer's identification system. Frederick Robertson, president of Design Consultants, testified that the objectives were to bring identification unity within Pioneer's many divisions and to create a meaningful, appropriate, unique, and dis-

---

1. Based on figures for 1978, the last year for which figures for both companies were introduced into evidence. In 1968, Wilson's sales equaled slightly more than ¼ of 1% of Pioneer's sales. From 1968 to 1978 Wilson's sales increased about sevenfold and Pioneer's sales about doubled.

tinctive identification program. The goal was to design a sign for Pioneer that would create instant recognition—a sign that could be recognized by its color, format and shape, without reading its words. The project, which cost Pioneer $125,000, was completed in 1964 with the adoption by Pioneer of the sign it continues to use to this day.

The Pioneer sign[2] is hexagon in shape with the top and bottom sides horizontal. Its background color is white. The lower portion of the sign consists of a red panel bordered by the white background. This red panel is sometimes blank, but usually it bears a field variety number or the word "seeds" or "corn" printed in white. Whether there is printing on the red panel and if so, its content, depends on the particular use of the sign. The middle portion of the sign immediately above the red panel bears the name "Pioneer" in black block letters. In the center of the top portion of the sign appears a trapezoid outline within which is contained the outline of a corn plant springing from the infinity symbol. This trapezoidal symbol is usually in black, although on some long lasting metal signs it is green. The name "Pioneer" with the trapezoidal symbol above it constitutes Pioneer's house mark, which also appears on its stationery, literature, advertising and seed bags.

The red panel usually occupies the lower one-third of the sign, but on some special use signs its depth varies. On a large highway sign, its depth is one-fifth of the sign's height. A sign denoting the business place of a Pioneer dealer will have the dealer's name printed in black on a gray panel occupying the lower one-sixth of the sign with the red panel occupying the one-sixth portion of the sign immediately above the gray panel. One sign introduced into evidence bears a blank red panel occupying just a little less than the lower one-half of the sign. (The fractions mentioned in this paragraph are approximate.)

Pioneer uses the sign as a highway sign, a field sign, a hybrid variety sign, a salesman sign, as a truck and window decal, and as an emblem on clothing.

In 1968[3] Pioneer had in use in all but ten states: 8,275 highway signs, 900 of which were in Iowa; 63,320 field signs, 16,500 of which were in Iowa; 6,950 variety signs, 2,000 of which were in Iowa; 5,335 salesman signs, 560 of which were in Iowa; 4,930 clothing emblems, of which 3,800 were in Iowa; and 2,080 window and truck decals, of which 2,050 were in Iowa.

In 1976[4] Pioneer had in use in all but five states 5,532 highway signs, 50 of which were in Iowa; 59,605 field signs, 5,550 of which were in Iowa; 9,705 variety signs, 1,150 of which were in Iowa; 6,330 salesman signs, 650 of which were in Iowa; 8,320 clothing emblems, of which 6,100 were in Iowa; and 3,270 window and truck decals, of which 1,650 were in Iowa.

The signs are present at trade shows and fairs, field demonstrations and agronomy meetings. The field and variety signs are commonly posted beside fields of Pioneer hybrid seed corn. Signs are posted along the highway and at dealers' places of business and at other Pioneer facilities. The decals appear on vehicles and the clothing emblems appear on clothing of Pioneer employees and dealers. Pioneer uses pictures of its signs in its printed advertising, and the signs appear in its television commercials.

From 1964 to the present the total cost of Pioneer's signs has exceeded one million dollars. The total cost of all other advertising by Pioneer since 1964, most of which contains representations of the sign, has exceeded forty million dollars.

Pioneer does not place an image of its sign on its seed bags. Only the house

---

2. A photograph of Pioneer's sign appears in Appendix A attached hereto.

3. 1968 is the year that Wilson began using the first of its signs challenged by Pioneer in this litigation.

4. 1976 is the year that Wilson began using the second of its signs challenged by Pioneer in this litigation.

mark, the name "Pioneer" with the trapezoidal symbol above it, appears on the seed bags. However, a Pioneer sign is usually present at places where bags of seed are sold.

In February of 1978 Pioneer used for the first time, in an agronomy newsletter, a representation of its sign without any house marks or printing thereon. (This variety of the sign will hereinafter be referred to as the blank sign format.[5]) The blank sign format has been used only in agronomy newsletters and in Pioneer's catalog.

In early 1962 Wilson began to use a diamond-shaped sign. This sign's background color was white. The upper quarter of the sign contained a red triangle bordered by the white background on which was printed in white "seed corn." The lower quarter of the sign contained a red triangle bordered by the white background on which was printed in white "Harlan, Ia." On the white space between the two red triangles was printed "Wilson Hybrids" with the name "Wilson" in large block letters and the word "hybrids" written below in a smaller script. When the sign was used to identify a hybrid seed corn variety, the variety number was placed on a placard affixed to the signpost immediately below the sign. Wilson used this sign until 1968, and it never caused Pioneer any concern.

In 1968 Wilson adopted a new sign, which was designed by Dennis Stamp, a member of the family that owns Wilson and its present president. When he designed Wilson's new sign, which will hereinafter be referred to as the 1968 sign, Mr. Stamp and his father, who was then Wilson's president, were aware of Pioneer's existence and had seen Pioneer's signs. There is some circumstantial evidence that Mr. Stamp may have used the Pioneer sign as a model for the shape of the Wilson 1968 sign.

The 1968 Wilson sign [6] is hexagon in shape, the angles and the proportions being nearly the same as those of the Pioneer sign. The bottom part of the Wilson sign is slightly longer, proportionately, than the bottom part of the Pioneer sign, which is closer to a regular hexagon. Its background color is white, like Pioneer's sign. The lower half of the sign consists of a red panel bordered by the white background, like Pioneer's sign. In the middle of the red panel is a smaller white panel in which is printed in red block letters the word "seeds." On the upper portion of the sign in red block letters is the name "Wilson," above which are four small red stars. The name "Wilson" and the stars are enclosed within a red line that extends from the lower red panel and parallels the outer edge of the upper portion of the sign a fraction of an inch from the outer edge. On field variety signs the field variety number rather than the word "seeds" was printed on the small white panel in the middle of the red panel, and on dealer signs the word "dealer" appeared instead of the word "seeds."

Wilson used its 1968 sign until 1976.

In 1976 Dennis Stamp retained John Hoeppner of the Hoeppner Advertising Agency of Sioux City, to redesign Wilson's sign into what will hereinafter be referred to as the 1976 sign.[7] The hexagonal shape remained the same. The depth of the red panel in the lower portion was slightly reduced making the red and white color proportions very close to those of the Pioneer sign. The red printing within a white panel on the red panel was replaced with white printing directly on the red panel, like the Pioneer sign. On field variety signs, the field variety number was printed on the red panel, like the Pioneer sign. On the new sign the Wilson name was printed on the upper white portion in the same color used by Pioneer to print its name and trapezoi-

---

**5.** A photograph of Pioneer's blank sign format appears in Appendix A attached hereto.

**6.** A photograph of Wilson's 1968 sign appears in Appendix A attached hereto.

**7.** A photograph of Wilson's 1976 sign appears in Appendix A attached hereto.

dal symbol, black. The style of print was changed to lower case, and the space above the last three letters was filled with small black printing of "hybrids" or "since 1926." The four red stars and the red line border remained. The cost of redesign was $40,-000–$50,000.

When Mr. Stamp and Mr. Hoeppner redesigned the Wilson sign, they were fully aware of the existence and the appearance of the Pioneer sign.

Wilson has used the 1976 sign since it was designed, and for all intents and purposes Wilson has abandoned the 1968 sign, although a few 1968 signs may still be out in the countryside.

Wilson's use of its 1968 sign and its 1976 sign is essentially the same as Pioneer's use of its sign, including the posting of field and variety signs beside fields of Wilson hybrid seed corn. Like Pioneer, Wilson uses pictures of its signs in its printed advertising and the signs appear in its television commercials. Unlike Pioneer, Wilson uses an image of the full sign as its house mark on its feed bags, stationery, etc.

Like Pioneer, Wilson believes that its sign provides company identification and considers the sign to be valuable to the company as a projection of the company image to the public.

Wilson's annual advertising expenditures rose from $14,432 in 1968 to $258,280 in 1978.

Pioneer's house mark, the word "Pioneer" with the trapezoidal symbol above, are the subject of United States trademark registration. Pioneer registered its sign as a service mark with the state of Iowa in 1978. Pioneer has filed applications to register its sign and its blank sign format in the United States Patent and Trademark Office, but these applications have been opposed by Wilson in administrative proceedings, and these administrative proceedings are stayed pending the outcome of the

instant litigation. Wilson has filed application to register its 1976 sign in the United States Patent and Trademark Office, but this application has been opposed by Pioneer and that proceeding is also stayed pending the outcome of the instant litigation.

Pioneer became aware of Wilson's 1968 sign no later than late 1970.[8] At that time Rex Hall, who is responsible to Pioneer's corporate counsel for watching the corporation's trademarks and keeping them protected, saw a photograph in a trade journal depicting Wilson weigh wagons displaying the 1968 sign. He wrote to David Garst and Thomas Hybrid Corn Company in Coon Rapids, Iowa, Pioneer's major distributor, as follows:

Dave, I enclose a copy of the October 28, 1970 SEED TRADE NEWS, page 18, with a picture of weigh wagons used by Wilson Hybrids of Harlan, Iowa.

The shape of the Wilson Hybrids identification on the weigh wagons and their automobiles appears to be a pretty close copy of the Pioneer hexagonal vehicle marking, field sign, etc. However, whether or not we can say they are infringing our registered trademark depends upon whether or not their mark is creating confusion in the market. Have you heard anyone remark that Wilson markings look like Pioneer? Are you concerned that Wilson's image is enough like us to cause farmers to think Wilson could be a source for Pioneer brand seed?

I'll appreciate your comments. The enclosed page from SEED TRADE NEWS is the only copy I have, so will you please return it together with your comments? Thanks, Dave.

Garst, whose Coon Rapids location is about 45 miles from Wilson's Harlan location, replied:

The shape of the Wilson Hybrids identification does appear to be pretty close to the Pioneer hexagonal vehicle mark-

---

**8.** There is some evidence that Pioneer sales persons had seen Wilson's 1968 sign as early as 1968.

ing. I don't think it is so close that you can call it an infringement, however. I also do not think that it is causing any confusion in the market.

I have, for example, never heard anyone ever remark that the marking looked like Pioneer ... and am not concerned that the Wilson image is enough like ours to cause farmers to think they could be a source for Pioneer brand seed....

Mr. Hall then took the matter up with his superiors, and they decided to let the matter rest.

Pioneer made no protest to Wilson concerning Wilson's 1968 or 1976 signs until 1978, when notice of alleged infringement was given by Pioneer to Wilson. However, during the time following Wilson's adoption of its 1976 sign, Pioneer became actively concerned about the matter.

The vast majority of signs used by each party are field signs which are located next to fields of the party's hybrid seed corn. Variety signs are used in the same manner. A person usually sees these signs while traveling along a road next to a corn field. He will see the shape and colors of the signs, including the color of the printing, but may not, because of distance, lighting, vegetation and the movement of his vehicle, as well as the limited time he can safely remove his line of vision from the road if he is the driver, be able to read the printing. Signs other than field and variety signs may also be observed under conditions which preclude the viewer from reading the printed words.

Farmers buying seed corn are discriminating purchasers, and there is no likelihood

whatsoever that any similarity in the signs of Pioneer and Wilson and any confusion the signs may cause will result in a farmer buying one party's product in the mistaken belief that it is the other party's product. (Indeed, Pioneer concedes that there will be no such purchasing confusion.)

*Ultimate Facts*

(1) Pioneer has failed to prove that its blank sign format, the basic white and red colored hexagon without printing, is inherently distinctive or had become a distinguishing identifier of Pioneer and its products and services by 1968.

(2) Pioneer has proved that its 1964 sign is inherently distinctive and at all times material has served as a distinguishing identifier of Pioneer and its products and services.

(3) Pioneer has failed to prove that there is a likelihood of confusion between Pioneer's sign and Wilson's 1968 sign, but Pioneer has proved that there is a strong likelihood of confusion between Pioneer's sign and Wilson's 1976 sign.[9] Persons observing a 1976 Wilson sign under circumstances where they cannot or do not read the Wilson name on the sign may very easily mistake it for a Pioneer sign, and vice versa. Such non-reading circumstances often occur.

(4) Pioneer has proved that Wilson's use of its 1976 sign creates a likelihood of dilution of the distinctive quality of Pioneer's sign.

CONCLUSIONS OF LAW

15 U.S.C. § 1125(a) provides:

**9.** This finding rests on all of the relevant evidence including my observations at a demonstration along the street outside the courthouse during the morning of the second day of trial. The demonstration consisted of viewing Pioneer field and variety signs, 1968 Wilson field and variety signs and 1976 Wilson field and variety signs at various distances, beginning at the maximum distance of 400 feet. The three field signs faced up-street, the direction from which I was walking on the opposite side of the street. The three smaller variety signs faced . across the street. The details of the mechanics of the demonstration were dictated into the record by

counsel, but my observations were not, so it is appropriate that I now set them forth. At any distance, the 1968 Wilson field sign did not look much like the other field signs—the marked difference in color of print caused a substantial difference in overall appearance. I was not able to read the 1968 Wilson field sign until I was between 150–200 feet from it. The 1976 Wilson field sign and the Pioneer field sign looked remarkably similar until I was close enough to read the printing on them, at about 250 feet. I could not see details of the smaller variety signs very well until I approached the area across the street from them.

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Iowa Code § 548.10 provides:

Any person who without the consent of the registrant uses any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter in a manner which is likely to cause confusion, mistake, or deception of purchasers; or reproduces, counterfeits, copies, or colorably imitates any registered mark and applies such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in a manner which is likely to cause confusion, mistake, or deception of purchasers in this state; shall be liable in a civil action by the registrant of the mark, for any or all of the remedies provided in section 548.11.

Iowa Code § 548.11 provides:

1. The registrant of a mark that has been infringed may be granted an injunction against an infringer in accordance with the principles of equity. The court in its discretion may allow the registrant to recover the damages caused by the infringement or the profits of the infringer attributable to the infringement, or both. The court may order any counterfeits or imitations in the possession or under the control of an infringer to be destroyed and in exceptional cases the court may also award reasonable attorney fees to the prevailing party.

2. Likelihood of injury to business reputation or to a trade name valid at common law, or of dilution of the distinctive quality of a mark, whether registered or not registered under this chapter, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

15 U.S.C. § 1127 provides in part: "The term 'service mark' means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others."

Iowa Code § 548.1(2) provides:

"*Mark*" means a word, name, symbol, device, or any combination of the foregoing in any form or arrangement used as a certification mark, collective mark, service mark, or trade-mark.

\* \* \* \* \* \*

c. "*Service mark*" means a mark used by a person to identify services and to distinguish them from the services of others.

Pioneer contends that it has a protectible interest under 15 U.S.C. § 1125(a) and Iowa Code §§ 548.10 and 548.11 in its blank sign format, the basic white and red colored hexagon without printing. Although the blank sign format was not used as such until 1978, the basic white and red colored hexagon with Pioneer's house mark and other printing placed thereon has been used by Pioneer as its sign since 1964.

The court has found as an ultimate fact that the blank sign format is not inherently distinctive. Therefore, to prevail Pioneer must establish secondary meaning in the red and white hexagon format. The Eighth Circuit has adopted the following statement of the necessary elements to establish secondary meaning:

[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning," in which the original user has a property right which equity will protect against unfair appropriation by a competitor.

*Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1219 (8th Cir.1976), *quoting from Shoppers Fair of Arkansas, Inc. v. Sanders Co.*, 328 F.2d 496, 499 (8th Cir.1964), *quoting from Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas*, 185 F.Supp. 895, 903 (E.D.Ark.1960).

Pioneer relies heavily on *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir.1980). I find that case clearly distinguishable on the facts. Levi Strauss involved the unique technique of permanently identifying the origin of pants by sewing one end of a small identifying "pocket tab" into the seam of a hip pocket, leaving the pocket tab exposed to view. In the course of a few decades, this pocket tab acquired secondary meaning distinctiveness. In the instant case, a unique technique of identifying Pioneer and its products and services is not involved. An ordinary outdoor sign is involved, and Pioneer's evidence fails to persuade me that its bare shape and two-color format acquired, by the time Wilson went to a similar format in 1968,[10] the secondary meaning claimed by Pioneer. Wilson began using the red and white hexagon format only four years after Pioneer began using it. With the exception of the testimony of one witness, who as a teenage boy observed a 1968 Wilson sign and concluded from that observation that Wilson might have some connection with Pioneer, the only evidence that Pioneer produced tending to show that the blank sign format in itself has acquired secondary meaning is the survey taken in 1979, eleven years after Wilson began using the red and white hexagon. Furthermore, Pioneer's failure· to protest Wilson's use of the red and white hexagon format until 1978 suggests Pioneer's own lack of recognition of a secondary meaning in the blank sign format in 1968. It is the court's conclusion that Pioneer had no protectible interest in the blank sign format in 1968, when Wilson began using a similar format.[11]

The full Pioneer sign is another matter. The evidence clearly shows that Pioneer's services are not limited to those purely incidental to the sale of seed, and therefore this court concludes that the full Pioneer sign has at all times material hereto constituted a service mark of Pioneer within the meaning of the federal and state statutes. *In re Heavenly Creations* (T.T. A.B.1971), 168 U.S.P.Q. 317; *In re John Breuner Co.* (T.T.A.B.1963), 136 U.S.P.Q. 94. The sign is validly registered as a service mark with the state of Iowa.

10. Assuming, but not deciding, that Pioneer's blank sign format is now a protectible mark, and not merely functional or background in nature, Pioneer can nevertheless not prevail on this issue without proving that the secondary meaning had come into existence at the time Wilson began using the red and white hexagon format in 1968. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978).

11. Even if Pioneer had a protectible interest in the blank sign format in 1968, Pioneer might be barred by laches from enforcing its rights against Wilson, which has used a similar format for its signs continuously since 1968. (Although Wilson has abandoned its 1968 sign, it never abandoned the red and white hexagon format, which remained the format of the 1976 sign.) Pioneer learned of Wilson's use of the red and white hexagon format no later than 1970, but deliberately chose to do nothing about the matter until 1978. In the meantime, Wilson engaged in extensive use of its signs in the countryside of its trade area and in its printed and televised advertising, as well as using an image of its signs on its feed bags. Although laches may not usually bar injunctive relief to preclude future infringement of a plaintiff's rights in a mark, in exceptional cases laches is a bar to injunctive relief. *Layton Pure Food Co. v. Church & Dwight Co.*, 182 F. 24, 41 (8th Cir. 1910).

■ The ultimate issue in a mark infringement case is likelihood of confusion, a fact issue. *Vitek Systems, Inc. v. Abbott Laboratories,* 675 F.2d 190 (8th Cir.1982); *Squirtco v. Seven-Up Co.,* 628 F.2d 1086, 1090–91 (8th Cir.1980).

■ Because the court has found as an ultimate fact that there is no likelihood of confusion between Wilson's 1968 sign and the Pioneer sign, Wilson's 1968 sign does not infringe on the Pioneer sign and Wilson's use of that sign does not constitute unfair competition.

■ The court, however, has found as an ultimate fact that there is a strong likelihood of confusion between Pioneer's sign and Wilson's 1976 sign. Furthermore, this court has found as an ultimate fact that at all material times Pioneer's sign has served as a distinguishing identifier of Pioneer and its products and services—in other words, at all material times Pioneer's sign has held a secondary meaning. The court has also found that Wilson's use of its 1976 sign creates likelihood of dilution of the distinctive quality of Pioneer's sign. *See Polaroid Corp. v. Polaroid, Inc.,* 319 F.2d 830 (7th Cir.1963). These findings of ultimate fact lead the court to conclude that Wilson's use of its 1976 sign infringes on plaintiff's sign and constitutes unfair competition by Wilson with Pioneer. Wilson is not saved by the fact that the upper portion of its sign carries its name rather than the Pioneer house mark. This does not avoid the likelihood of confusion in the minds of the many viewers who see the signs, Pioneer's or Wilson's, under circumstances precluding them from being able to actually read the printed black material on the upper portion of the signs. *Levi Strauss & Co. v. Blue Bell, Inc., supra,* 632 F.2d at 822.

Pioneer is entitled to the injunctive relief it seeks against Wilson's continued use of its 1976 sign. Pioneer is not entitled to the broader injunctive relief it seeks against Wilson's use of its 1968 sign and use of any sign utilizing a red and white hexagon format.

This is not an exceptional case justifying an award of reasonable attorney fees to the prevailing party.

## JUDGMENT

IT IS THE JUDGMENT OF THE COURT that defendant, Wilson Hybrids, Inc., and its officers, agents, servants, employees and attorneys and those persons in active concert or participation with them are hereby enjoined from further use of Wilson's 1976 sign or any other colorable imitation of Pioneer's sign in conjunction with agricultural business services pertaining to plants and seeds.

IT IS THE FURTHER JUDGMENT OF THE COURT that defendant, Wilson Hybrids, Inc. shall file with this court, on or before June 1, 1982, a detailed plan for reaching full compliance with the foregoing injunction as rapidly as reasonably possible. Within ten days after such filing by Wilson, the plaintiff shall file a response indicating whether or not it accepts defendant's compliance plan. If plaintiff objects to the plan or any part of it the court will, after hearing, enter necessary implementing orders.

IT IS THE FURTHER JUDGMENT OF THE COURT that additional injunctive relief sought by plaintiff is denied.

IT IS THE FURTHER JUDGMENT OF THE COURT that the clerk enter judgment in favor of the plaintiff and against the defendant for the costs of this litigation.

IT IS THE FURTHER JUDGMENT OF THE COURT that the award of reasonable attorney fees sought by plaintiff is denied.

10

Pioneer's blank sign format

Pioneer's sign (one without the usual white printing on the red panel)

Wilson's 1968 sign

Wilson's 1976 sign